Joseph R. & Lynda M. GILES, as Parents & Legal Representatives of Garrett Joseph Giles, deceased, Petitioners,

v.

SECRETARY OF THE DEPARTMENT OF HEALTH AND HUMAN SERVICES, Respondent.

No. 94–230V.

United States Court of Federal Claims.

March 7, 1997.

Kirk A. McCarville, Phoenix, AZ, for petitioners.

David L. Terzian, United States Department of Justice, Washington, D.C., with whom was Gerard W. Fischer, Assistant Director, Torts Branch, Civil Division, for respondent.

## OPINION

HORN, Judge.

Petitioners, Joseph R. and Lynda M. Giles, filed their petition for compensation under the National Childhood Vaccine Injury Act of 1986, as amended, 42 U.S.C. §§ 300aa–1 to –34 (1994)[1] ("Vaccine Act"), as parents and legal representatives of their deceased son, Garrett Joseph Giles. Petitioners allege that their infant son died on February 9, 1993, as a direct sequela of a Diphtheria–Pertussis–Tetanus ("DPT")[2] vaccination, administered to the infant on February 12, 1992. The case

---

1. Tit. XXI, § 2112, as added Nov. 14, 1986, Pub.L. No. 99–660, tit. III, § 311(a), 100 Stat. 3761; Dec. 22, 1987, Pub.L. No. 100–203, tit. IV, §§ 4303(d)(2)(A), 4307(3), 101 Stat. 1330–222, 1330–224 and amended Dec. 22, 1987, Pub.L. No. 100–203, tit. IV, §§ 4303(d)(2)(A), 4307(3), 101 Stat. 1330–222, 1330–224, Pub.L. No. 100–203, tit. IV, §§ 4307(3)(c), 4308, as amended and added July 1, 1988, Pub.L. No. 100–360, tit. IV, § 411(o)(2), (3)(A), 102 Stat. 808; Dec. 19, 1989, Pub.L. No. 101–239, tit. IV, § 6601(d)–(i), 103 Stat. 2286–2290; Nov. 3, 1990, Pub.L. No. 101–502, § 5(b), 104 Stat. 1286; Nov. 26, 1991,

Pub.L. No. 102–168, tit. II, § 201, 105 Stat. 1102; Oct. 27, 1992, Pub.L. No. 102–531, tit. III, § 314, 106 Stat. 3508; June 10, 1993, Pub.L. No. 103–43, tit. XX, § 2012, 107 Stat. 214; Aug. 10, 1993, Pub.L. No. 103–66, tit. XIII, § 13632, 107 Stat. 646; Dec. 14, 1993, Pub.L. No. 103–183, tit. VII, § 708, 107 Stat. 2242.

2. In their petition, Mr. & Mrs. Giles refer to the "DTP/OPV & HIB immunization" received by Garrett Giles. The Vaccine Injury Table also refers to DTP. 42 U.S.C. § 300aa–14(a)(1).

is before this court on petitioners' motion for review of the special master's decision, issued September 11, 1996, which denied compensation to the petitioners. *Giles v. Sec'y DHHS,* No. 94–0230V, Fed.Cl. Office of Spec. Mstr., September 11, 1996. Petitioners filed their Motion for Review on October 9, 1996, alleging that the special master acted arbitrarily and capriciously, not in accordance with the law, and abused his discretion in reaching his decision. The respondent filed a Memorandum in Response to Petitioners' Motion for Review on November 8, 1996, requesting this court to uphold the special master's decision.

In their claim for compensation under the National Vaccine Injury Compensation Program ("Vaccine Program"), filed April 8, 1994, petitioners alleged that Garrett "suffered anaphylaxis, an encephalopathy and hypotonic-hyporesponsive collapse as defined in the Vaccine Injury Table, as set forth in *42 U.S.C.A. 300aa–14* within the applicable time limits of that table and his death is a direct sequela of the DPT vaccination he received on February 12, 1992." Respondent maintained that Garrett did not suffer anaphylaxis, encephalopathy, or hypotonic-hyporesponsive collapse (HHC) [3] within 72 hours of his February 12, 1992 DPT vaccination. Instead, respondent asserted that Garrett developed severe bronchiolitis from respiratory syncytial virus ("RSV"), a factor unrelated to the DPT vaccination, and that the symptoms Garrett evidenced within three days of the vaccination were due entirely to the RSV

infection, and not due to the immunization. In addition, respondent contended that Garrett died from respiratory disease and gastro-esophageal reflux, rather than from a vaccine-related condition.

The special master held a two day hearing starting on June 20, 1996. Following a review of the testimony and the documents included in the record, the special master issued a summary, written decision which denied compensation to the petitioners under the Vaccine Program. The special master found that the petitioners had established a *prima facie* case that Garrett sustained a table injury—encephalopathy—which began abruptly within hours of Garrett's DPT vaccination, with respiratory distress and apnea soon after. The special master, however, also found that the respondent had met its burden of establishing that "Garrett's condition—respiratory distress and apnea leading to encephalopathy—was due to factors unrelated to the administration of Garrett's February 12, 1992 DPT vaccination." (Citing 42 U.S.C. § 300aa–13(a)(1)(B)).

In the conclusion to his opinion, the special master wrote:

> Based upon the record as a whole—Garrett's medical records, Dr. Glezen's testimony and medical literature—the special master finds that there is a preponderance of the evidence that Garrett suffered RSV. The special master finds also that there is

---

**3.** Whereas the petitioners in their complaint refer to hypotonic-hyporesponsive collapse (HHC), a number of the medical experts who testified at the hearing before the special master referred to hypotonic-hyporesponsive episode (HHE). The Vaccine Injury Table for DTP, 42 U.S.C. § 300aa–14(a)(1), refers to shock-collapse or hypotonic-hyporesponsive collapse. The qualifications and aids to interpretation section of the Vaccine Injury Table defines shock-collapse or hypotonic-hyporesponsive collapse as:

> evidenced by indicia or symptoms such as decrease or loss of muscle tone, paralysis (partial or complete), hemiplegia or hemiparesis, loss of color or turning pale white or blue, unresponsiveness to environmental stimuli, depression of consciousness, loss of consciousness, prolonged sleeping with difficulty arousing, or cardiovascular or respiratory arrest.

42 U.S.C. § 300aa–14(b)(1).

In *Hossack v. Secretary DHHS,* 32 Fed.Cl. 769 (1995), the court wrote:

> A hypotonic-hyporesponsive episode (HHE) is an abrupt change in muscle tone and level of consciousness, usually brief with no permanent injury, while a shock collapse (sometimes HHC) is "a drop in blood pressure that occurs either when the heart is incapable of pumping blood sufficiently, or when the blood vessels dilate so that blood pools in extremities and the body cavity so that there is inadequate blood returning to the heart to pump."

*Id.* at 770 n. 3 (citations omitted). The court in *Hossack* explained that while HHE and shock collapse may not be the same thing in a strict medical sense, " 'the statutory scheme makes no such distinction.' " *Id.,* 32 Fed.Cl. at 770 n. 3 (citations omitted). Although the special master questioned Dr. Kinsbourne regarding the medical community's definition of HHE & HHC, in his opinion, he referred only to HHC and appeared to blur the distinction.

a preponderance of the evidence that Garrett's RSV was principally responsible for Garrett's respiratory distress and apnea leading to encephalopathy. Thus, the special master concludes that Garrett's February 12, 1992 DPT vaccination coincided merely with Garrett's RSV.

## FACTS

Garrett was born on December 2, 1991 in Winter Haven, Florida. He weighed six pounds, fifteen ounces, and was discharged from the hospital in good health. At Garrett's two-week checkup on December 16, 1991, his pediatrician found that he was doing well. Garrett was seen again by his pediatrician, however, on December 20, 1991, due to vomiting after several feedings. A barium swallow test of his upper gastrointestinal tract yielded negative results.

On the morning of February 12, 1992, Garrett returned to his pediatrician for a routine two-month visit. Although he had a slightly elevated temperature (99.8 degrees), and was experiencing some colic, he had an otherwise normal physical evaluation. According to the medical chart, Garrett had clear and equal breath sounds, no rales, rhonchi, or retractions. His chest examination was essentially clear, as were his throat, ear, and neurological exams.

During this same visit, Garrett received his first DPT/OPV/HIB immunizations.[4] Lynda Giles, Garrett's mother, testified that as the shot was being administered, Garrett began to scream and cry very hard. Eventually, his crying subsided into general fussiness, and Mrs. Giles took Garrett home. According to Mrs. Giles, shortly after returning home, she became increasingly concerned about Garrett because his lips were "a little bluish," and his body generally felt "real limp." Shortly thereafter, when her husband came home, Garrett's breathing had become wheezy and raspy. In addition, his chest appeared to be "caving in with his breathing." Mrs. Giles' sister, Elizabeth Craig, who also arrived at the Giles home, Mrs. Giles, and Mr. Giles all observed that Garrett was very pale, and that one could almost see the darker color of his blood vessels through his skin. Mrs. Giles called the pediatrician, described Garrett's condition over the phone, and was instructed to return with him to the doctor's office.

The pediatrician's medical chart indicates that Garrett returned to his office because of "[l]abored raspy respirations since office visit this A.M. Lips cyanotic for 15 minutes after returning home." The doctor sent Garrett to Winter Haven Hospital, where he was admitted at approximately 4:00 p.m., with a principal diagnosis of bronchiolitis. The medical records upon his admission reported that, at the time of his immunizations, Garrett "had a very faint wheezing noted when he cried at one time but this was not persistent." His admission physical examination also revealed "an alert, white male who is in obvious respiratory distress," with "[d]iffuse bilateral rales and expiratory wheezes with decreased breath sounds bilaterally."

Garrett was placed in an oxygen tent and given appropriate antibiotics, while further diagnostic testing continued. The admitting documents to Winter Haven Hospital stated that Garrett "will also be placed on breathing treatments and bronchodilators, and treatment with Ribavirin will be initiated, depending his RSV."

Despite treatment for his symptoms, Garrett's condition worsened, and at 6:40 a.m. on February 13, he went into respiratory arrest. He was intubated and transferred to St. Joseph's Hospital in Tampa, which had better facilities for intensive pediatric care. According to the medical records, Garrett left Winter Haven Hospital at 9:20 a.m. and arrived at St. Joseph's Hospital at 9:56 a.m.

A laboratory report from Winter Haven Hospital indicates that three tests for the presence of RSV were performed—one on February 12, 1992 and two on February 13, 1992. The first two tests, from specimens taken at an unknown time on February 12, and at 7:06 a.m. on February 13, produced negative results. According to the lab re-

---

4. DPT is Diphtheria–Pertussis–Tetanus, OPV is oral polio vaccine, and HIB is H–Influenza Type B.

port, a third RSV test, with a collection time of 11:20 a.m. on February 13, was positive for RSV. According to the medical records, however, 11:20 a.m. is after the time that Garrett was discharged from Winter Haven Hospital for transfer to another hospital.[5]

The chief diagnosis upon admission to St. Joseph's Hospital was bronchial respiratory distress with apnea. According to the medical records, Garrett had "pupils that were equal and reactive to light. Extraocular movements were full. The baby has motion of sucking ability and appears to be strong on admission." Three additional tests for RSV were performed at St. Joseph's Hospital, but all three proved to be negative.[6]

Dr. Daniel Plasencia, a witness for petitioners at the hearing, was Garrett's principal treating physician at St. Joseph's Hospital. At the time of Garrett's discharge from the hospital on February 21, 1992, Dr. Plasencia diagnosed Garrett's condition as follows:

1. Respiratory tract infection, likely viral, with RSV, one RSV smear was positive from the referring institution.

2. Respiratory failure secondary to # 1.

3. Gastroesophageal reflux documented by PH probe.

4. Neuromuscular weakness or hypotonia, etiology to be established, workup in progress.

Upon discharge from St. Joseph's Hospital, Garrett was examined by a pediatric neurologist, Dr. Jose Fordada III, who found evidence of developmental delay, as well as central or muscle hypotonia. An exhibit in the record indicates that although Dr. Fordada noted that Garrett's initial problems oc-

curred around his DPT immunization, he "strongly believe[d] that this was just coincidental, and no true relationship is noted."

On July 18, 1992, Garrett was hospitalized a second time at St. Joseph's Hospital for a weak cry and unusual respirations, and difficulty breathing. Upon discharge on July 22, 1992, the final diagnoses read that Garrett suffered "a status post viral reaction to DPT," as well as "aspiration pneumonia," "muscular hypertonia," "otitis media," and "reactive airway disease." Garrett was hospitalized a final time on February 6, 1993. According to his parents he had become limp and had difficulty breathing after vomiting heavily. He died at St. Joseph's Hospital on February 9, 1993, at 10:40 a.m. Dr. Plasencia's discharge summary listed the cause of death as "[r]espiratory failure with aspiration pneumonia leading to adult respiratory distress syndrome and multiple organ system failure."

At the hearing, petitioners presented testimony by the parents and maternal aunt on the first day. On the second day, the special master heard testimony from the administrator of the clinical lab at Winter Haven Hospital and from the medical experts[7] offered by both parties.

On behalf of the petitioners, Garrett's treating pediatrician, Dr. Plasencia, testified that in his opinion Garrett "likely did not have RSV." The colloquy with Dr. Plasencia continued as follows:

Q Can you conclude with a medical degree of certainty that he did not have RSV in light of the fact that he had five negative tests and one positive test?

A No RSV infection.

Q That's your opinion?

---

5. In order to explain the testing procedures for RSV at Winter Haven Hospital, petitioners called Walter Roberts, the Administrative Director of the hospital's clinical lab. He testified that it is routine practice for the collection time of a specimen to be entered in the lab computer when known, and that, typically, the results of a test are reported four or five hours after collection. Mr. Roberts' testimony also established that the results of the second RSV test were not available until 11:22 a.m. on February 13. Mr. Roberts, however, was unable to explain the discrepancy regarding the 11:20 a.m. collection time record-

ed for the third test, when Garrett was no longer at Winter Haven Hospital.

6. Specimens for two of the RSV tests conducted at the second hospital, St. Joseph's, were collected on February 13 at 3:00 p.m. and February 14 at 2:55 p.m. It is not clear from the medical records when the specimen for the third test was collected.

7. Prior to the hearing, the parties stipulated that the witnesses proffered as medical experts by each side were qualified as experts.

A Yes.

At the hearing, Dr. Plasencia stated that Garrett had hypotonia, which is not seen in conjunction with RSV, and that Garrett's course of recovery during and after his hospitalization was unusual and not typically seen in a patient with RSV. Dr. Plasencia also expressed the opinion that Garrett exhibited several symptoms of a hypotonic-hyporesponsive episode (HHE).

On cross-examination, Dr. Plasencia tried to explain away his discharge diagnosis of Garrett's condition on February 21, 1992— "[r]espiratory tract infection, likely viral, with RSV," in light of his testimony at the hearing that Garrett did not have RSV. Dr. Plasencia testified:

A At that time [of discharge from St. Joseph's Hospital on February 21, 1992] the only thing that I can go by and pinpoint with the positive RSV is one test that I had from the referring institution prior to coming to us.

I been [sic] made aware there was two other previous tests. But even considering that, there was other—there was other stuff that we had in the case.

But that—At the time my discharge summary was dictated we had no tests coming back from metabolic studies that we were pursuing. And it was always in our mind how quickly he presented after a DPT injection.

\* \* \* \* \* \*

Even though we did not make mention of that at the time. And that's the reason that the only thing that I had to conclude at this point, the only thing I had to grab, that I had had a positive—one positive RSV smear.

Q When you completed this discharge summary, were you aware of the three subsequent negative tests at your hospital?

A Yes.

Q And you still indicated at that point that you thought he had RSV, at this point?

A We were treating it as a respiratory disease process. And that's the only thing I had to go by at the time we discharged the patient home. And that was then my statement, my conclusion.

Going back and knowing that metabolic studies were negative and all the—We pursued that very deeply and very extensively. It was my feeling that knowing the two other negatives that he had and knowing that there's still a statistical chance that you can have one false positive smear, then I feel more likely that he didn't have RSV.

Q What are the statistical chances of having a false positive?

A Very small. I would think it's probably less than ten percent. But there is a statistical chance that you can have a false positive.

The principal expert witness to testify on behalf of petitioners was Dr. Marcel Kinsbourne, a pediatric neurologist. In his expert medical report, submitted as one of a number of supplemental exhibits in petitioners' case, Dr. Kinsbourne concluded:

In summary, no cause for Garrett's static encephalopathy was ever ascertained. It clearly began abruptly with respiratory distress within hours of a DPT vaccination, and apnea soon after. It must therefore be regarded as due to the pertussis vaccine. His severe loss of motor control was apparent as soon as he was available for examination. This abrupt and enduring loss of motor control, leading to continued apneas and aspirations, ultimately resulted in his death. It is therefore my opinion, to a reasonable degree of medical certainty, that Garrett died on account of a static encephalopathy that was caused by the pertussis vaccine.

At the hearing, Dr. Kinsbourne also stated his opinion that Garret suffered an HHE within a few hours of his DPT immunization, with acute encephalopathy within 72 hours of the immunization.[8] He noted that the cause

8. Dr. Kinsbourne's testimony about the timing of the occurrence of Garrett's encephalopathy, however, was inconsistent. During his direct examination, counsel for petitioners focused Dr. Kinsbourne's attention on an entry in Garrett's admission records to St. Joseph's Hospital that indicated "The patient had pupils that were equal and reactive to light. Extra ocular move-

of the hypotonia diagnosed by Dr. Plasencia at St. Joseph's Hospital was never determined. Dr. Kinsbourne further testified that Garrett's death a year later resulted from his neurologic syndrome of hypotonia in the aftermath of his acute encephalopathy. Thus, according to Dr. Kinsbourne, when Garrett vomited on February 6, 1993, his neurologic impairment caused aspiration, which caused severe impairment to his lung function, acute encephalopathy, and ultimately death. In his testimony, Dr. Kinsbourne dodged the issue of whether RSV was a correct diagnosis.

Dr. Kinsbourne further made clear that in his opinion there was no evidence that Garrett had suffered anaphylaxis. Apparently because Dr. Kinsbourne was petitioners' principal expert witness, and because he did not offer any support for petitioners' assertion contained in the petition for compensation that Garrett had suffered anaphylaxis, the special master indicated to the parties, during the hearing, that he no longer considered anaphylaxis to be an issue in the case. Neither petitioners nor respondent have contested the special master's finding in this regard, and, therefore, anaphylaxis is not in dispute before this court.

Respondent called two expert witnesses. The first was Dr. Max Wiznitzer, an associate professor of pediatrics, neurology, and international health at Case Western Reserve University and a child neurologist at Rainbow Baby's and Children's Hospital. He testified that Garrett "did not have a hypotonic hyporesponsive episode," and that there was "no support in the medical records" for such a conclusion. Dr. Wiznitzer explained that the physical characteristics identified by other witnesses, such as pallor, bluish lips, fever, and respiratory fatigue, could each be explained as due to other causes.

Dr. Wiznitzer also based his evaluation on the significant respiratory distress exhibited by Garrett; the absence of neurological abnormalities noted by his pediatrician on the afternoon of February 12, 1992, at the time of his first admission to St. Joseph's Hospital on February 13, 1992, and at the time that sedative and paralyzant drugs had worn off on February 14, 1992; the fact that the medical records showed no prolonged loss or diminution in mental status; and the fact that Garrett's condition improved with a Proventil treatment and drugs such as SusPhrine, an adrenalin-like agent that helps improve the function of the pulmonary tree. Regarding the cause of Garrett's illness, Dr. Wiznitzer stated: "I would say RSV until proven otherwise." On cross examination, Dr. Wiznitzer agreed that he believed it was RSV "to a medical degree of certainty." As for the cause of Garrett's death, Dr. Wiznitzer found: "aspiration due to gastroesophageal reflux."

Although Dr. Wiznitzer believed that Garrett was compromised neurologically [9] at the time of his death, and that this condition contributed to his death, Dr. Wiznitzer also concluded that it was not a static encephalopathy, and that Garrett's death was not a sequela of an encephalopathy related to his DPT shot. As the special master noted in his decision, however, Dr. Wiznitzer testified that "he could easily support a statement that Garrett experienced an [ischemic] insult to the brain within three days after his February 12, 1992 DPT vaccination that was sufficient to cause hypotonia that was evident upon a neurological examination on February

ments were full. The baby has motion of sucking ability and appears to be strong on admission," and then asked Dr. Kinsbourne if this contradicted his opinion that Garrett suffered an encephalopathy. Dr. Kinsbourne explained that the encephalopathy occurred at 6:40 the morning after this notation was made, when Garrett suffered respiratory arrest. However, Garrett went into respiratory arrest at Winter Haven Hospital in the early morning of February 13, 1992, which was prior to his admission to St. Joseph's Hospital. During cross examination, when Dr. Kinsbourne realized the correct timing of events, he testified that "it must be the case that the dam-

age [encephalopathy] had some latency in appearing."

9. In his decision, the special master noted that Dr. Wiznitzer and other neurologists who had examined Garrett commented upon the possibility that Garrett exhibited a neurologic disorder similar to that suffered by two maternal uncles who had died in infancy. The special master emphasized, however, that his ultimate decision in the above-captioned case did not depend upon Dr. Wiznitzer's suggestion of a preexisting condition.

18, 1992," and that " '[t]here's no doubt' that Garrett exhibited a 'chronic encephalopathy' before his death."

Respondent's second medical expert witness was Dr. W. Paul Glezen, a pediatrician and professor and head of the Preventive Medicine Section, Department of Microbiology and Immunology and Pediatrics, at Baylor College of Medicine in Houston, Texas. Initially, Dr. Glezen stated his opinion that Garrett did not have HHE or encephalopathy. He stated that Garrett presented with an acute respiratory illness, caused by a virus, or otherwise stated, that Garrett suffered RSV bronchiolitis.[10] Dr. Glezen noted that medical evaluation tests done on Garrett showed that he also was allergic and asthmatic, and that these conditions related to the reflux reactions exhibited by Garrett. In addition, Dr. Glezen testified that the child's later medical problems are compatible with and can be explained by RSV.

Later in his testimony Dr. Glezen stated that the cause of Garrett's death was aspiration, as a result of vomit entering his lungs. During this portion of Dr. Glezen's testimony, the following colloquy occurred with Dr. Glezen:

Q How did he die? What was the cause of his death?

A He died of aspiration. In other words, he vomited and the vomitus got into his trachea, into his lungs.

Q Is that related to the RSV that he had a year before?

A Well, no. I don't think that's—I think that's related to his—, his asthma and his general neurologic condition, which I won't attempt to characterize.

But not to—Not necessary to the bronchiolitis. I think that to the RSV, no, I wouldn't relate that to the RSV.

Q When was the reflux problem first manifested?

A That was—The first evidence, of course, occurred, I think, at two weeks of age. But certainly before—Well before he had his first DTP (sic) because he had vomiting problems then and those were manifest throughout his medical records.

Dr. Glezen also addressed RSV and its clinical course, explaining that the onset may be sudden with the first presenting symptom as apnea or lack of breathing. Thus, like Dr. Wiznitzer, Dr. Glezen explained that symptoms such as pallor and rapid presentation of severe illness can be symptoms caused by an illness, i.e. RSV, unrelated to the DPT vaccination. Further, Dr. Glezen, addressed the one positive test for RSV. He indicated that studies show that the likelihood of a false positive as very low.

### DISCUSSION

When deciding a motion to review a special master's decision, the judges of this court shall:

(A) uphold the findings of fact and conclusions of law of the special master and sustain the special master's decision,

(B) set aside any findings of fact or conclusions of law of the special master found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and issue its own findings of fact and conclusions of law, or,

(C) remand the petition to the special master for further action in accordance with the court's direction.

42 U.S.C. § 300aa–12(e)(2).

As stated in the legislative history of the Vaccine Act:

The conferees have provided for a limited standard for appeal from the [special] master's decision and do not intend that this procedure be used frequently but rather in those cases in which a truly arbitrary decision has been made.

H.R.Conf.Rep. No. 386, 101st Cong., 1st Sess. 512–13, 517, *reprinted in* 1989

---

**10.** In response to a question on cross examination which mentioned chest x-rays of Garrett which were found to be normal, Dr. Glezen had expressed an interest in reviewing the x-rays himself. Therefore, following the hearing, and at the request of the special master, Dr. Glezen examined the chest x-rays of Garrett taken at Winter Haven Hospital on February 12 and 13, 1992. Dr. Glezen determined that the x-rays clearly showed bronchiolitis as an explanation of the acute findings presented by Garrett's illness following his DPT injection.

**534**

U.S.Code Cong. & Admin.News 1906, 3115, 3120.

Although review by the judges of this court of decisions issued by the special master should be conducted within the bounds described above, 42 U.S.C. § 300aa–12(e)(2) dictates that the judges of this court should utilize differing and distinguishable standards of review, depending upon which aspect of the case is under scrutiny. As stated by the United States Court of Appeals for the Federal Circuit:

> These standards vary in application as well as degree of deference. Each standard applies to a different aspect of the judgment. Fact findings are reviewed by us, as by the Claims Court judge, under the arbitrary and capricious standard; legal questions under the 'not in accordance with law' standard; and discretionary rulings under the abuse of discretion standard. The latter will rarely come into play except where the special master excludes evidence.

*Munn v. Sec'y DHHS*, 970 F.2d 863, 870 n. 10 (Fed.Cir.1992). Adopting these guidelines, the judge in *Cox v. Sec'y DHHS* likewise wrote:

> Each standard articulated in 42 U.S.C. § 300aa–12(e)(2)(B) applies to a different aspect of the special master's decision. The court evaluates findings of fact under the 'arbitrary and capricious standard'; legal conclusions under the 'not in accordance with the law standard'; and discretionary rulings under the 'abuse of discretion standard.' *See Munn v. Sec'y DHHS*, 970 F.2d 863, 870 (Fed.Cir.1992).

*Cox v. Sec'y DHHS*, 30 Fed.Cl. 136, 142 (1993); *see also Grice v. Sec'y DHHS*, 36 Fed.Cl. 114, 117 (1996); *Rooks v. Sec'y DHHS*, 35 Fed.Cl. 1, 4 (1996); *Perreira v. Sec'y DHHS*, 27 Fed.Cl. 29, 32 (1992), *aff'd*, 33 F.3d 1375 (Fed.Cir.1994).

■ The arbitrary and capricious standard of review is a narrow one, *Johnston v. Sec'y DHHS*, 22 Cl.Ct. 75, 76 (1990); *see Cucuras v. Sec'y DHHS*, 993 F.2d 1525, 1527 (Fed. Cir.1993); *Bradley v. Sec'y DHHS*, 991 F.2d 1570, 1574 (Fed.Cir.1993); *Estate of Arrowood v. Sec'y DHHS*, 28 Fed.Cl. 453, 457 (1993); *Perreira v. Sec'y DHHS*, 27 Fed.Cl. at 31–32 (1992); *see also Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 (1971), and highly deferential, *Burns v. Sec'y DHHS*, 3 F.3d 415, 416 (1993); *Hines v. Sec'y DHHS*, 940 F.2d 1518, 1528 (Fed.Cir. 1991). When applying the arbitrary and capricious standard, a reviewing court is not empowered to substitute its own judgment for that of a previous trier of fact. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. at 416, 91 S.Ct. at 823–24. Instead, when determining whether a decision was arbitrary and capricious, a court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.; see Hines v. Sec'y DHHS*, 940 F.2d at 1527.

■ Furthermore, "[i]f the special master has considered the relevant evidence in the record, drawn plausible inferences and articulated a rational basis for the decision, reversible error will be extremely difficult to demonstrate." *Burns v. Sec'y DHHS*, 3 F.3d at 416; *Hines v. Sec'y DHHS*, 940 F.2d at 1528; *see Lewis v. Sec'y DHHS*, 26 Cl.Ct. 233, 236 (1992); *Murphy v. Sec'y DHHS*, 23 Cl.Ct. 726, 729–30 (1991), *aff'd*, 968 F.2d 1226 (Fed.Cir.1992), *cert. denied sub nom.*, 506 U.S. 974, 113 S.Ct. 463, 121 L.Ed.2d 371 (1992). Thus, the decision of a special master may be found to be arbitrary and capricious only if the special master:

> relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence … or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Hines v. Sec'y DHHS*, 940 F.2d at 1527 (quoting *Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)).

Moreover, according deference to the special master's decision requires that the reviewing court "may not substitute its own judgment for that of the special master if the special master has considered all relevant

factors, and has made no clear error of judgment." *Lonergan v. Sec'y DHHS*, 27 Fed.Cl. 579, 579–80 (1993); *Perez v. Sec'y DHHS*, 27 Fed.Cl. 200, 201 (1992) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. at 416, 91 S.Ct. at 823–24; *Hyundai Elecs. Indus. Co. v. United States Int'l Trade Comm'n*, 899 F.2d 1204, 1209 (Fed.Cir.1990); *Gamalski v. Sec'y DHHS*, 21 Cl.Ct. 450, 451–52 (1990)).

Although the arbitrary and capricious standard is widely used, there is no uniform definition of this standard. In *Hines v. Secretary of the Department of Health and Human Services*, however, the United States Court of Appeals for the Federal Circuit has accumulated, and offered as guidance, a wide variety of examples in which the arbitrary and capricious standard has been applied:

'an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise,' *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Automobile Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983) (review of agency rule making); agency must articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made,' *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962) (review of agency adjudication); 'proof that there was 'no reasonable basis' for the administrative decision will also suffice [to show arbitrary and capricious conduct], at least in many situations,' *Prineville Sawmill Co., Inc. v. United States*, 859 F.2d 905, 913 (Fed.Cir.1988) (quoting *Keco Ind., Inc. v. United States*, 492 F.2d 1200, 1203–04, 203 Ct.Cl. 566 (1974)) (review of preaward bid protest action against letting of government contract); reviewing court must "guard against an agency's drawing inferences that are 'arbitrary' in relation to the facts found, no matter how substantial may be

the support for those facts," *Midtec Paper Corp. v. United States*, 857 F.2d 1487, 1498 (D.C.Cir.1988) (review of agency adjudication); 'the central focus of the arbitrary and capricious standard is on the rationality of the agency's 'decision-making,' rather than its actual decision,' *United States v. Garner*, 767 F.2d 104, 116 (5th Cir.1985); 'whether the decision was based on a consideration of relevant factors, whether there has been a clear error of judgment and whether there is a rational basis for the conclusions ...,' *Mobil Oil Corp. v. Department of Energy*, 610 F.2d 796, 801 (Temp.Emer.Ct.App.1979), *cert. denied*, 446 U.S. 937, 100 S.Ct. 2156, 64 L.Ed.2d 790 (1980) (review of agency rulemaking) (quoting *Texaco, Inc. v. Federal Energy Admin.*, 531 F.2d 1071, 1076–77 (Temp. Emer.Ct.App.1976)).

*Hines v. Sec'y DHHS*, 940 F.2d at 1527–28.

 The " 'not in accordance with law' standard" which applies to legal questions warrants *de novo* review. *Hossack v. Sec'y DHHS*, 32 Fed.Cl. at 773 (citing *Neher v. Sec'y DHHS*, 984 F.2d 1195, 1198 (Fed.Cir. 1993)); *see also Bradley v. Sec'y DHHS*, 991 F.2d at 1574 n. 3.

 Compensation under the Vaccine Program is determined pursuant to the statutory guidelines set forth in the Vaccine Act. According to the Act, a petitioner is eligible for compensation only if the petitioner can demonstrate, by a preponderance of the evidence, 42 U.S.C. § 300aa–13(a)(1)(A), the multiple criteria required by 42 U.S.C. § 300aa–11(c)(1), including that the child received a vaccine set forth in the Vaccine Injury Table, the alleged injury was one recognized by the Vaccine Injury Table, and the onset of the alleged injury occurred within the specified statutory time limit. *See Hellebrand v. Sec'y DHHS*, 999 F.2d 1565, 1569 (Fed.Cir.1993). If the petitioner makes this showing, the table injury is presumed to be caused by the vaccine. *Munn v. Sec'y DHHS*, 970 F.2d at 865. However, the respondent may rebut this presumption by showing by "a preponderance of the evidence on the record as a whole 'that the illness, disability, injury, condition, or death de-

scribed in the petition, is due to *factors unrelated to the administration of the vaccine described in the petition.*'" *Knudsen v. Sec'y DHHS,* 35 F.3d 543, 547 (Fed.Cir.1994) (emphasis in original) (quoting 42 U.S.C. § 300aa–13(a)(1)(B)); *Whitecotton v. Sec'y DHHS,* 17 F.3d 374, 376 (Fed.Cir.1994), *rev'd on other grounds sub. nom., Shalala v. Whitecotton,* 514 U.S. 268, 115 S.Ct. 1477, 131 L.Ed.2d 374 (1995).

In their motion for review, petitioners claim that when he rendered his decision, the special master: 1) applied an incorrect standard of proof to determine alternative causation; 2) acted arbitrarily and capriciously by finding that RSV was a factor unrelated to the DPT vaccination which led to Garrett's condition; 3) and acted arbitrarily and capriciously and abused his discretion by failing to consider important aspects of the evidence and failing to offer explanations for his decisions that, according to petitioners, ran counter to the evidence. Petitioners ask that rather than remanding this case to the special master for correction of his errors, this court should uphold the special master's finding of a table injury, reject the special master's finding of alternative causation, and order that petitioners are entitled to compensation.

As noted above, the special master held that the petitioners "established their *prima facie* claim that Garrett sustained an encephalopathy that 'began abruptly with respiratory distress within hours of a DPT vaccination, and apnea soon after.'" Before this court, neither party disputes the holding that petitioners established a table injury of encephalopathy. Because petitioners met their initial burden of proof, the burden then shifted to respondent to rebut the established *prima facie* case by a preponderance of the evidence that Garrett's condition was "due to factors unrelated to the administration" of the February 12, 1992 DPT vaccination to Garrett. 42 U.S.C. § 300aa–13(a)(1)(B). Specifically, in this case, in which respondent advanced a theory of viral infection as a factor unrelated to the immunization, respondent bore the burden of first proving the existence of a viral infection, and then proving "by a preponderance of the evidence that

the particular viral infection present in the child actually *caused* the table injury complained of." *Knudsen v. Sec'y DHHS,* 35 F.3d at 549 (emphasis in original).

▬ Petitioners allege that words chosen by the special master for inclusion in his decision in the above-captioned case indicate that the special master applied a lower standard of proof than the applicable preponderance of the evidence standard when he reached his determination of alternative causation. Petitioners are correct that the applicable standard for respondent to establish alternative causation is the preponderance of the evidence test. *See* 42 U.S.C. § 300aa–13(a)(1)(B). In the context of a Vaccine Act case, the preponderance of the evidence standard has been explained as more than a probability. The special master must "believe that the existence of a fact is more probable than its nonexistence, before the [special master] may find in favor of the party who has the burden to persuade the [special master] of the fact's existence." *Ciotoli v. Sec'y DHHS,* 18 Cl.Ct. 576, 588 (1989) (quoting *In re Winship,* 397 U.S. 358, 371, 90 S.Ct. 1068, 1076, 25 L.Ed.2d 368 (1970) (Harlan, J. concurring) (quoting F. James, Civil Procedure 250–51 (1965))); *see also Hines v. Sec'y DHHS,* 940 F.2d at 1525. Otherwise stated, the preponderance of the evidence standard requires the petitioner to "adduce evidence that makes the existence of a contested fact more likely than not." *Estate of Arrowood v. Sec'y DHHS,* 28 Fed.Cl. 453, 458 (1993) (quoting *McClendon v. Sec'y DHHS,* 23 Cl.Ct. 191, 195 (1991) (citing Black's Law Dictionary 1064 (5th ed. 1979))).

The special master specifically referred to the applicable burden of proof in three different sections of his opinion. First, at the end of the introduction section, the special master wrote:

Therefore, the burden shifts to respondent to rebut the Gileses' *prima facie* case with a preponderance of the evidence that Garrett's condition—respiratory distress and apnea leading to encephalopathy—was "due to factors unrelated to the administration" of Garrett's February 12, 1992 DPT vaccination. § 300aa–13(a)(1)(B).

At the start of the discussion section, the special master, however, wrote:

> In order to rebut the presumption that Garrett's February 12, 1992 DPT vaccination caused Garrett's respiratory distress and apnea leading to encephalopathy, respondent must show that it is probable that Garrett in fact suffered RSV. Then, respondent must show that it is probable that RSV was "principally responsible for *causing*" Garrett's respiratory distress and apnea leading to encephalopathy. *See Knudsen,* 35 F.3d at 549, *citing* § 300aa–13(a)(2) (emphasis in original).

Finally, in his conclusion, the special master wrote:

> Based upon the record as a whole—Garrett's medical records, Dr. Glezen's testimony and medical literature—the special master finds that there is a preponderance of the evidence that Garrett suffered RSV. The special master finds also that there is a preponderance of the evidence that Garrett's RSV was principally responsible for Garrett's respiratory distress and apnea leading to encephalopathy. Thus, the special master concludes that Garrett's February 12, 1992 DPT vaccination coincided merely with Garrett's RSV.

The court believes that although the special master's articulation of the legal standard at the start of the discussion section of his opinion was imprecise, he, in fact, utilized the proper burden of proof in reaching his decision. In the introduction and conclusion sections of his opinion, the special master properly cited to the preponderance of the evidence standard of proof. The conclusion to the special master's opinion is clear as to what standard he used to reach his final decision. Moreover, although the special master used the word "probable" twice at the start of the discussion section of his opinion, this alone is not proof that he applied an incorrect standard. In this offending paragraph, the special master also cited to a page in *Knudsen v. Secretary of the Department of Health and Human Services,* 35 F.3d 543, 549 (Fed.Cir.1994), which clearly states that in cases of alternative causation, the respondent must "prove by a preponderance of the evidence that the particular viral infection present in the child actually *caused* the table injury complained of." *Id.* at 549 (emphasis in original).

In addition, although the special master articulated an improper standard in one paragraph of his opinion, and did not include an extensive analysis of the facts, or make extensive findings of facts, he conducted an appropriate analysis, related his reasons for relying heavily on some evidence over other evidence, and issued relevant findings of fact. *See Hossack v. Sec'y DHHS,* 32 Fed.Cl. 769, 776 (1995). The hearing transcript and opinion indicate that the special master examined the exhibits and listened to the hearing testimony. The special master was clear in his opinion that he had evaluated the credibility of the medical experts. He found Dr. Glezen to be "a highly-qualified and extraordinarily compelling witness," and stated that the testimony of petitioners' expert witnesses "do not dissuade the special master." Moreover, the record supports the special master's credibility determinations and heavy reliance on the respondent's expert witnesses. The hearing transcript and exhibits establish that Dr. Glezen had extensive experience with RSV. Dr. Glezen's study of RSV dated back to 1963, he had written or contributed to several articles on RSV cited in a reputable medical textbook on pediatric infectious diseases, and he regularly surveyed RSV cases as part of hospital, community, and longitudinal family studies of respiratory illness. The special master cited to Dr. Glezen's testimony regarding the clinical course of RSV and Garrett's medical history at length, and noted that petitioner's expert witnesses failed to provide persuasive testimony that Garrett did not suffer RSV.

The special master also indicated that he relied on the testimony of respondent's other expert witness, Dr. Wiznitzer, who explained that Garrett experienced "an [ischemic] insult to the brain within three days after his February 12, 1992 DPT vaccination that was sufficient" to cause neurological abnormalities evident upon an examination on February 18, 1992, and that Garrett exhibited a "chronic encephalopathy before his death."

In sum, the special master's obviously incorrect use of the word probable on two

occasions at the start of the discussion section in the middle of his opinion was not enough to invalidate his final conclusion. Moreover, the record, including the hearing testimony and the exhibits filed in the above-captioned case, supports the finding by the special master that the respondent demonstrated, by a preponderance of the evidence, that RSV was the cause of Garrett's illness and death, and was unrelated to the DPT immunization he received.

Next, petitioners allege that the special master erred in finding that RSV was the cause of Garrett's respiratory distress and apnea without discussing or referencing encephalopathy and HHC. As stated by petitioners:

> [T]he Special Master made his findings as to the causal relationship of RSV in the context of what caused Garrett's respiratory distress and apnea, leading to encephalopathy.... the focus of the Decision in this case was the cause of respiratory distress and apnea, with no discussion or reference to encephalopathy and HHC, the two table injuries set forth by the Petitioners which ultimately lead to Garrett's death.

According to petitioners, the special master erroneously limited his review to the cause of several symptoms Garrett exhibited—respiratory distress and apnea—rather than the "illness, disability, injury, condition, or death described in the petition," 42 U.S.C. § 300aa–13(a)(1)(B), namely anaphylaxis, encephalopathy, and HHC.

In this regard, petitioners also claim that the special master reached "inconsistent results" because Dr. Kinsbourne, the only witness to testify directly that Garrett sustained an encephalopathy, also stated that the encephalopathy was caused by HHE. Thus, according to the petitioners, in concluding that Garrett suffered a table injury of encephalopathy, the special master either found Dr. Kinsbourne's testimony persuasive and should have embraced the necessary corollary that Garrett suffered HHC, or the special master based his conclusion on a series of events "not testified to by anyone." Moreover, petitioners argue that because the special master relied so heavily on the testimony of Dr. Glezen, who stated that Garrett had not sustained a table injury, he had no grounds to link the diagnosis of RSV made by Dr. Glezen to a table injury, which the special master had concluded was suffered by Garrett.

Petitioners argue that the special master's finding as to petitioners' *prima facie* claim of having suffered an encephalopathy "subsumed" a conclusion that Garrett's death was an "acute complication or sequela" of the encephalopathy table injury, which they argue was caused by the DPT immunization. The special master's decision rejects this approach. The special master's opinion states that the petitioners "established their *prima facie* claim that Garrett sustained an encephalopathy that began abruptly with respiratory distress within hours of a DPT vaccination." Thus, the special master concluded that the petitioners had met their burden of proof to establish a Table Injury under 42 U.S.C. § 300aa–14(a). Although nowhere in his written decision does the special master articulate what he believes to have been the cause of Garrett's death, his conclusion under § 300aa–13a(1)(B), that a factor unrelated to the administration of the vaccine, namely RSV, caused Garrett's respiratory distress and apnea leading to encephalopathy, made a further determination as to Garrett's resulting death unnecessary.

As noted above, in Vaccine Act cases based on a table injury claim, 42 U.S.C. § 300aa–13(a) requires that the special master make two separate determinations. The first determination is whether the child suffered one of the injuries or conditions listed in the table, within the time period specified in the table for that injury or condition. *See Hellebrand v. Sec'y DHHS*, 999 F.2d 1565, 1569 (Fed.Cir.1993); 42 U.S.C. § 300aa–13(a)(1)(A). If a petitioner makes a showing of a table injury by a preponderance of the evidence, the law presumes that the immunization caused the condition, and that the petitioner is presumptively entitled to compensation. *See Knudsen v. Sec'y DHHS*, 35 F.3d at 547. The burden of proof then shifts to the respondent, and the second determination the special master is required to make is whether the government has rebutted the

presumption of entitlement to compensation by showing, also by a preponderance of the evidence, that the table injury was in fact caused by factors unrelated to the vaccine. *Id.* at 549; *see also Whitecotton v. Sec'y DHHS,* 17 F.3d at 376; 42 U.S.C. § 300aa–13(a)(1)(B).

At the start of his opinion, the special master set out the positions of both the parties, first, petitioners' claim that Garrett suffered anaphylaxis, encephalopathy, and HHC, and respondent's position that Garrett suffered none of these injuries within the relevant time periods.[11] Immediately thereafter, the special master found a table injury and wrote that "the Gileses have established their *prima facie* claim that Garrett sustained an encephalopathy" beginning with respiratory distress and apnea. Following his determination of a table injury, encephalopathy, the special master used the remainder of his decision to discuss the causation of Garrett's table injury. The special master found that RSV was "principally responsible for Garrett's respiratory distress and apnea leading to encephalopathy." [12]

Although the special master does not articulate specific conclusions regarding HHC or HHE, in his opinion, contrary to petitioners' argument, the fact that the special master concluded that Garrett's injury resulted from "respiratory distress and apnea leading to encephalopathy" does not mean that he limited his review to Garrett's symptoms of respiratory distress and apnea. After presiding over the hearing [13] and reviewing the record,

the special master concluded that Garrett's encephalopathy, which began with respiratory distress and apnea, was the table injury responsible for Garrett's illness. By so concluding, he rejected Dr. Kinsbourne's testimony that respiratory distress and apnea suggest a finding of HHC, as claimed by petitioners, a different table injury, or HHE, as testified to by Dr. Kinsbourne. Accordingly, because in his opinion the special master found that Garrett suffered from an encephalopathy, not HHC, the special master did not have to reach the issue of whether RSV caused HHC.

■ Petitioners also argue that the special master acted arbitrarily and capriciously when he found that RSV, a factor unrelated to Garrett's DPT immunization, was responsible for Garrett's encephalopathy, and that the special master's finding was based on contradictory findings. According to petitioners, the basis for the special master's initial finding that Garrett suffered a table injury within 72 hours of his DPT vaccination was Dr. Kinsbourne's testimony indicating that Garrett's symptoms evidenced an encephalopathy. Petitioners point out, however, that Dr. Kinsbourne did not report a finding of RSV. Further, according to petitioners, because the basis for the special master's finding that Garrett had RSV was Dr. Glezen's testimony, and Dr. Glezen did not find an encephalopathy, the special master's finding of causation of the encephalopathy by a RSV infection could not be based on Dr. Glezen's professional opinion.

**11.** As noted above, during the hearing, the special master dismissed petitioners' claim that Garrett suffered anaphylaxis because petitioners failed to present expert testimony on the issue to support their claim.

**12.** The qualifications and aids to interpretation section of the Vaccine Injury Table defines "encephalopathy" as:

any significant acquired abnormality of, or injury to, or impairment of function of the brain. Among the frequent manifestations of encephalopathy are focal and diffuse neurologic signs, increased intracranial pressure, or changes lasting at least 6 hours in level of consciousness, with or without convulsions. The neurological signs and symptoms of encephalopathy may be temporary with complete recovery, or may result in various degrees of permanent impairment. Signs and symptoms

such as high pitched and unusual screaming, persistent unconsolable crying, and bulging fontanel are compatible with an encephalopathy, but in and of themselves are not conclusive evidence of encephalopathy. Encephalopathy usually can be documented by slow wave activity on an electroencephalogram.
42 U.S.C. § 300aa–14(b)(3)(A).

**13.** The hearing transcript reflects that the special master was concerned about developing an adequate record for making a determination regarding HHC. For example, he asked Dr. Kinsbourne to provide the medical community's definition of HHE, HHC, or shock collapse, and he questioned both Dr. Kinsbourne and Dr. Glezen regarding their opinions as to whether Garrett suffered HHC.

Petitioners' arguments, although not always clearly stated, seem to suggest that the special master was obliged to accept or reject each expert witness's testimony as a whole, rather than to weigh all the testimony and evidence in the record, in light of the independent factual and legal determinations the special master is required to make under the statute. The special master in a vaccine case is not simply the arbiter of the experts' opinions; rather he or she is both the trier of fact and the decider of law. *See* 42 U.S.C. § 300aa–12(d)(3)(A)(i). "Determining the weight and credibility of the evidence is the special province of the trier of fact." *Inwood Lab., Inc. v. Ives Lab., Inc.,* 456 U.S. 844, 856, 102 S.Ct. 2182, 2189, 72 L.Ed.2d 606 (1982); *see Raspberry v. Sec'y DHHS,* 33 Fed.Cl. 420, 423 (1995). Thus, the special master was free to accept or reject portions of the expert medical opinions presented to him in light of the entire record. *See Munn v. Sec'y DHHS,* 21 Cl.Ct. 345, 350 (1990), *aff'd,* 970 F.2d 863 (Fed.Cir.1992); *see also Mills v. Sec'y DHHS,* 27 Fed.Cl. 573, 578 (1993). Moreover, the special master is not obligated to accept the entirety of an expert's interpretation of an individual's medical history. *See, e.g., Munn v. Sec'y DHHS,* 21 Cl.Ct. at 350.

The special master concluded that Garrett suffered an encephalopathy within 72 hours of Garrett's DPT vaccination, brought on by either a respiratory infection, according to Dr. Wiznitzer, or respiratory arrest, according to Dr. Kinsbourne. Taken together, the testimony of these two expert doctors provided sufficient evidence for the special master to conclude, by a preponderance of the evidence, that Garrett suffered an encephalopathy. Dr. Kinsbourne, testified that Garrett suffered an acute encephalopathy because of his impaired lung function, and that the acute encephalopathy occurred at 6:40 a.m. on February 13, 1992, when Garrett stopped breathing and went into full respiratory arrest. The basis for Dr. Kinsbourne's opinion that Garrett suffered HHE within a few hours of receiving his DPT vaccination included "[t]he descriptors in the record of pallor, cyanosis, difficulty breathing, shallow breathing, and the unresponsiveness that was described by Mrs. Giles." Although these symptoms ar-

guably fall within the statutory aids to interpretation of HHC, examination of Garrett's medical records lead to a contrary conclusion.

The medical records upon Garrett's discharge from St. Joseph's Hospital on February 21, 1992, reflect a diagnosis of hypotonia, which might be consistent with HHC. However, the medical records also indicate that Garrett's lips were blue for only 15 minutes at home on February 12, 1992, and that he was "alert" upon examination at the pediatrician's office later that afternoon. According to the records of his admission to Winter Haven Hospital on February 12, 1992, Garrett exhibited "good capillary refill" and a symmetric Moro response, which is a reflex reaction in infants triggered by a change in the position of the infant's head in relation to the body. When he was admitted to St. Joseph's Hospital following his respiratory arrest, Garrett's pupils were "equal and reactive to light" and he exhibited "motion of sucking ability and appear[ed] to be strong." Starting at midnight on February 14, 1992, after Garrett had begun to recover from his respiratory arrest and fever, and the sedative and paralyzant drugs administered to him had begun to wear off, nursing notes indicate that Garrett opened his eyes spontaneously and had normal spontaneous movements. These indications run counter to the statutory standards for a diagnosis of HHC of "unresponsiveness to environmental stimuli, depression of consciousness, loss of consciousness, prolonged sleeping with difficulty arousing. . . ." 42 U.S.C. § 300aa–14(b)(1). Moreover, as testified to at length by Dr. Wiznitzer, such indications do not support a finding of hyporesponsive collapse, one of the major elements of HHC.

As the court in *Cucuras v. Sec'y DHHS* stated:

Medical records in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium.

These records are also generally contemporaneous to the medical events.

*Cucuras v. Sec'y DHHS*, 993 F.2d at 1528; *see also Burns v. Sec'y DHHS*, 3 F.3d at 417. Therefore, the special master was fully within his discretion to believe the contemporaneous medical records over recollection testimony offered by the petitioners, including Dr. Kinsbourne's opinion regarding HHE. *See Reusser v. Sec'y DHHS*, 28 Fed.Cl. 516, 523 (1993) (quoting *Murphy v. Sec'y DHHS*, 23 Cl.Ct. at 733).

It appears from the record that Dr. Glezen's opinion indicating Garrett sustained neither HHE nor an encephalopathy stemmed from his conviction that RSV could explain all of Garrett's symptoms. For example, during the hearing, Dr. Glezen stated: "I think what affects my review of this record mainly is that this looks like typical RS bronchiolitis. And I think it is not necessary or good to try to, you know, insert some other cause, you know, for his [Garrett's] problems." In his medical report submitted to the court, however, Dr. Glezen acknowledged that Garrett had experienced some neurological deterioration prior to his death. Dr. Glezen, however, did not conclude that there was sufficient evidence to meet the statutory criteria for encephalopathy within the time periods set out in the Vaccine Injury Table.

The special master's disagreement with Dr. Glezen regarding a finding of encephalopathy was not arbitrary and capricious because there was sufficient testimony from other expert witnesses to support the conclusion that Garrett suffered an encephalopathy. As the special master stated in his opinion, respondent's other expert, Dr. Max Wiznitzer, testified at the hearing that he could "easily support" a statement that Garrett experienced "an [ischemic] insult to the brain" at the time he went into respiratory arrest on February 13, 1992, that was sufficient "to cause hypotonia" evident during a neurological examination on February 18, 1992. The special master noted according to Dr. Wiznitzer, "[t]here's no doubt" that Garrett exhibited a "chronic encephalopathy" before his death. Dr. Wiznitzer, however, agreed with Dr. Glezen that the cause of Garrett's illness was RSV, stating that a viral infection, most likely RSV, provoked Garrett's neurological problems." [14]

Therefore, the special master was well within his discretion to conclude based on Dr. Wiznitzer's testimony, combined with Dr. Glezen's testimony, and the inferences included in Dr. Kinsbourne's testimony, that RSV was principally responsible for Garrett's respiratory distress and apnea, leading to encephalopathy. In sum, the special master had "considered the relevant evidence of record, drawn plausible inferences and articulated a rational basis for the decision...." *Hines v. Sec'y DHHS*, 940 F.2d at 1528. The court finds the special master's finding that Garrett suffered an encephalopathy and, as is discussed more fully below, that RSV, a factor unrelated to the immunization Garrett received, was responsible for Garrett's illness; was not arbitrary and capricious or an abuse of the special master's discretion.

Petitioners also argue that the special master was arbitrary and capricious and abused his discretion by failing to consider important evidence in the record and by failing to explain those portions of his decision that, according to petitioners, ran counter to the evidence, especially with regard to the special master's finding that RSV caused Garrett's illness. Petitioners claim that the single positive RSV test performed on Garrett was suspect, and that the special master should have addressed this one positive test in his decision. According to petitioners, based on the collection time listed on the laboratory report for the single positive RSV test conducted at Winter Haven Hospital, Garrett was already at St. Joseph's Hospital when the specimen allegedly was obtained, raising questions regarding the time of collection or whether the sample was obtained from Garrett.

Although petitioners may have cast some doubt on the reliability of the positive test result, and although the special master, per-

---

**14.** As noted above, according to Dr. Wiznitzer, Garrett also suffered from a preexisting condition, specifically mild hypotonia, which was ag-gravated by his acute respiratory infection from RSV.

haps, should have addressed the evidentiary issues regarding the one positive test, he had sufficient independent evidence in the record before him to reach the conclusion that Garrett suffered from RSV. After a review of the record, it remains unclear whether the positive test result was reliable. Although petitioners cite to the special master's quotation in his opinion of Dr. Glezen's statement that he " 'can hang [his] hat on' Garrett's one positive RSV test result, even though Garrett's other five RSV test results were negative," in fact, Dr. Glezen provided a lengthy rationale for why he believed the one positive RSV test could be relied upon, and more important, why the five negative tests did not negate a finding of RSV as the cause of Garrett's illness. Dr. Glezen explained that the detection test used at Winter Haven Hospital can only detect RSV when large numbers of plaque-forming units of the virus are present in the specimen, and that it is very difficult to get an adequate specimen from an infant's nasal secretions. Moreover, Ribavirin, the treatment for RSV which was administered to Garrett, inhibits the growth of the RS virus, and, thus, decreases the amount of virus available for testing. According to Dr. Glezen, although the test lacks sensitivity, its high specificity instills confidence in a positive result. Dr. Glezen stated:

We're talking about sensitivity versus specificity. Okay? It's 95 percent specific, but only 61 percent sensitive.[15] That means that even under the best of circumstances with a good specimen a lot of the tests are going to be negative. But when you find a positive, that's something that you can hang your hat on.

On cross examination, Dr. Glezen disagreed with counsel for petitioners that if he found the first two tests unreliable, he also would have to find the third test unreliable. Regarding the collection time of the positive test, Dr. Glezen testified that he would like to see the request form that went with the specimen to the lab, rather than the computer printout from the lab provided in the record.

Contrary to petitioners' suggestion, it is clear from the record that the one positive test result was not the basis for Dr. Glezen's opinion that Garrett had RSV. Dr. Glezen testified that even without the one positive result, he would have diagnosed RSV. Dr. Glezen's testimony presented the special master with a quantity of information on RSV and its clinical course, unrelated to the one positive test, including the following information summarized in the special master's opinion:

According to Dr. Glezen, infants who are between age two months and age three months are at greatest risk for infection with RSV. Dr. Glezen said that RSV is most prevalent in the winter months. Dr. Glezen described bronchiolitis as a signal illness of RSV. Thus, Dr. Glezen asserted that good medical practice assumes that a baby [who] comes into a physician's office or a hospital] in the middle of February with bronchiolitis is [a case of] RS[V] until you can prove it's not [a case of RSV]. Dr. Glezen indicated that RSV infection can have serious consequences, including sudden unexpected death, chronic lung disease and aggravation of an underlying chronic disease in young children.

Dr. Glezen applied his knowledge of RSV to Garrett's clinical course following Garrett's February 12, 1992 DPT vaccination. Dr. Glezen said that Garrett's record looks like typical RS bronchiolitis. Dr. Glezen described his understanding of Garrett's symptoms, including dyspnea,[16] retractions and wheezing, as reflected in Garrett's medical records. Dr. Glezen remarked that Garrett's pediatrician must have been convinced that Garrett's symptoms constituted RS bronchiolitis because the doctor ordered a[n] aerosol, which is specific treatment, licensed just for treatment of RS virus. Dr. Glezen noted that Garrett responded to the aerosol treat-

15. The package insert for the RSV test used at Winter Haven Hospital in 1992, stated that the test is 94 percent specific and 81 percent sensitive. Petitioner's witness, Dr. Plasencia, also testified, as did respondent's witness, Dr. Glezen, that the type of RSV test utilized has a statistical change of a false positive of less that ten (10) percent.

16. Dyspnea is difficulty breathing.

ment. Further, Dr. Glezen explained that Garrett experienced eventually respiratory arrest requiring intubation and mechanical ventilation because it just takes a tremendous amount of work for the babies to move air with bronchiolitis. And that's why they get tired and that's why they arrest.

(Citations omitted; footnote omitted.) This long recitation suggests that the special master relied on the totality of the evidence offered in Dr. Glezen's testimony, and not on the one positive test result, when he determined that Garrett suffered RSV.

In addition to the testimony described above, Dr. Glezen offered other observations to support his conclusion that RSV caused Garrett's condition. For example, at the request of the special master, following the hearing Dr. Glezen submitted a supplemental report on his review of the chest x-rays taken when Garrett was admitted to Winter Haven Hospital on February 12 and 13, 1992. Dr. Glezen reported that the x-rays reflected RS bronchiolitis. His report stated:

> The admission films, AP and lateral of 2/12, although not taken at the time of maximal inspiration—show mild peribronchial thickening visible through the heart shadow, on the right pericardial border, and possible in the L. upper lung field. The film of 2/13 (PA?) shows multiple small infiltrates of both upper lung fields indicating either interstitial involvement or subsegmental atelectasis. These findings are compatible with the clinical diagnosis of bronchiolitis.

> I asked two of my colleagues to look at the films with no medical history provided and they had essentially the same impressions.

Other evidence in the record, in addition to Dr. Glezen's testimony, also supports the special master's conclusion that Garrett had RSV infection and that this infection caused Garrett's encephalopathy. Like Dr. Glezen, Dr. Wiznitzer testified that "if a child presents with an acute respiratory illness, fever, normal-looking chest x-ray at presentation, then gets a respiratory arrest and it's in February, what's the causative organism, I would tell you the majority would say RSV." In addition, citing to references to mucus and

coughing in the February 1992 medical records from St. Joseph's, Dr. Wiznitzer expressed the firm opinion that Garrett had an acute respiratory infection.

Although at the time of the hearing he did not believe that Garrett suffered from RSV, petitioners' own expert witness, Dr. Plasencia testified to conditions presented by Garrett which are consistent with a respiratory infection. Dr. Plasencia noted that Garrett exhibited "secretions and wheezing," and expressed the belief that Garrett had some sort of "respiratory disease process." Moreover, Dr. Plasencia had diagnosed "[r]espiratory tract infection, likely viral, with RSV" in his discharge summary following Garrett's February 1992 hospitalization at St. Joseph's.

Based on this court's review of the record, there was a sufficient basis for the special master to conclude, by a preponderance of the evidence, that Garrett suffered from an RSV infection, without addressing the reliability of the single positive RSV test. Consequently, the special master did not act arbitrarily, capriciously or without regard to the law when he concluded that RSV was the cause of Garrett's illness, and that the RSV was unrelated to Garrett's immunization.

■ Petitioners also claim that the special master abused his discretion and acted arbitrarily and capriciously by "completely discount[ing] the testimony of the Petitioners [sic] expert witnesses, simply stating that they 'do not dissuade the Special Master from forming the firm opinion that Dr. Glezen presented through his testimony a logical, well-supported and correct medical interpretation of Garrett's February 1992 illness.'" From a reading of the special master's opinion, it is clear that the special master relied most heavily on Dr. Glezen's testimony when arriving at his ultimate decision. The special master found that Dr. Glezen presented a logical, well-supported, and correct medical interpretation of Garrett's February 1992 illness, apparently disagreeing with Dr. Glezen only as to whether Garrett's symptoms during his February 1992 hospitalization evidenced encephalopathy within the statutory time period in order to find that Garrett had suffered a table injury. The special master's

opinion, however, also shows that he reviewed and did not completely discount petitioners' expert witnesses. In fact, he relied on the statements of Dr. Kinsbourne for his conclusion that "Garrett sustained an encephalopathy that 'began abruptly with respiratory distress within hours of a DPT vaccination, and apnea soon after.'"

"The fact-finder has broad discretion in determining credibility because he saw the witnesses and heard the testimony." *Bradley v. Sec'y DHHS*, 991 F.2d at 1575. It is well-established that witness credibility is primarily within the purview of the special master as the trier of fact, and that the special master's determinations of credibility should be given appropriate deference because he had the opportunity to listen to the testimony, ask questions of the witnesses, and observe their demeanor. *Griessenauer v. Department of Energy*, 754 F.2d 361, 364 (Fed.Cir.1985); *Richardson v. Sec'y DHHS*, 23 Cl.Ct. 674, 678 (1991); *see also Burns v. Sec'y DHHS*, 3 F.3d at 417; *Snyder v. Sec'y DHHS*, 36 Fed.Cl. 461, 465 (1996); *Horner v. Sec'y DHHS*, 35 Fed.Cl. 23, 28 (1996). In this case, the special master also personally questioned the medical experts, even after the direct and cross-examination, in an effort to further evaluate the basis of their opinions and to assess their credibility. This court should not second-guess the well-formed credibility determinations of the special master unless they are proven to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. A special master's determinations regarding credibility are "virtually unreviewable." *Bradley v. Sec'y DHHS*, 991 F.2d at 1575 (citing *Hambsch v. Department of Treasury*, 796 F.2d 430, 436 (Fed.Cir.1986)); *Snyder v. Sec'y DHHS*, 36 Fed.Cl. at 465; *Walker v. Sec'y DHHS*, 33 Fed.Cl. 97, 100 (1995).

The record reflects that at the hearing petitioner's expert, Dr. Plasencia, gave his opinion that Garrett likely did not have RSV infection based on Garrett's presentation and on Garrett's course of recovery, which Dr. Plasencia described as atypical, based on his experience with RSV as a practicing pediatrician. Dr. Plasencia testified that infants with RSV present "with a little runny nose and maybe watery eyes and sneezing, coughing, very prominent. And that goes on for probably a good 48 hours before they turn around ... [o]r they become weak and it gets worse." Dr. Plasencia also stated that hypotonia, which he noted in his February 21, 1992 discharge summary for Garrett, is not typically seen in conjunction with RSV. Dr. Glezen, on the other hand, citing to a chapter on RSV in Ralph D. Feigin, M.D. and James D. Cherry, M.D., *Textbook of Pediatric Infectious Diseases* (3d ed.), testified that although many children with RSV present with mucus in their nose and a cough, the onset may be very sudden, with apnea as the first presenting symptom. According to Dr. Glezen, in cases, such as Garrett's, the infant is "too sick ... to cough," and the stress of the infant's illness causes pallor. Although Dr. Glezen did not specifically address the relationship between hypotonia and RSV, the reference to hypotonia in Garrett's February 21, 1992 discharge report did not give him pause.

In his report, Dr. Wiznitzer also provided the following explanation for Garrett's hypotonia, which is consistent with Dr. Glezen's explanation of Garrett's clinical course:

Until the time of his respiratory failure, Garrett Giles was not described as hypotonic or limp. This type of change in tone will occur with respiratory failure since, if the respiratory muscles are tired and weak, the body will be fatigued by the increased work at breathing and will also be "tired", thereby producing a decrease in tone.

Regarding credibility, Dr. Plasencia's primary experience with RSV was as a practitioner; he did not present evidence of specific expertise on RSV equal to that of Dr. Glezen. Moreover, Dr. Plasencia's diagnosis of "likely" RSV at the time of Garrett's hospital discharge on February 21, 1992, given with full knowledge of the five negative RSV test results, contradicted his opinion at trial. This court finds the credibility determination made by the special master, who chose to believe opinions other than that offered by Dr. Plasencia, not arbitrary or capricious.

The court finds the special master did not overlook or exclude evidence when he found

that Garrett suffered from RSV. Dr. Glezen's testimony, as well as Dr. Wiznitzer's, provided more than sufficient evidence, most of which was unrebutted, to support the special master's determination that RSV was the principal cause of Garrett's table injury.

Finally, regarding petitioners' objection to the special master's statement that "the Gileses did not call any medical witness to rebut Dr. Glezen's direct testimony," the court notes petitioners have failed to understand the context of the special master's remarks. At the conclusion of Dr. Glezen's testimony and respondent's case, the special master offered petitioners an opportunity to present rebuttal testimony. Petitioners declined to present new evidence, choosing rather to rely on the expert testimony they already had presented in their direct case to counter Dr. Glezen's opinion that Garrett had RSV.

### CONCLUSION

After a careful review of the record before this court and the applicable law, the court finds that the decision of the special master to deny compensation to the petitioners was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. Like the special master, the court empathizes with the tragic circumstances surrounding Garrett's death. However, under the statutory provisions of the Vaccine Act, the court is constrained to uphold the decision of the special master that the petitioners are not entitled to compensation. Therefore, the petitioners' motion for review is, hereby, DENIED. The court AFFIRMS the September 11, 1996 decision of the special master. The Clerk of the Court is directed to enter judgment in accordance with this decision.

**IT IS SO ORDERED.**

